UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GUELDA E. BROWN,

                              Plaintiff,

          -against-

MONTEFIORE MEDICAL CENTER,
DIANE RODRIGUEZ, ARETHA MACK,
VERONICA CRUTE, ANTHONY LEUNG,
and RUSSELL REILLE,

                              Defendants.

---

**MEMORANDUM
OPINION & ORDER**

18 Civ. 3861 (PGG) (KHP)

PAUL G. GARDEPHE, U.S.D.J.:

Pro se Plaintiff Guelda E. Brown brings this employment discrimination action against Defendants Montefiore Medical Center ("Montefiore"), Diane Rodriguez, Aretha Mack, Veronica Crute, Anthony Leung, and Russell Reille.  The Amended Complaint asserts claims for race, national origin, religious and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").  Brown also claims that she was denied medical leave in violation of the Family Medical Leave Act ("FMLA").  Finally, Brown asserts state law claims for assault, negligence, and breach of contract.  (See Am. Cmplt. (Dkt. No. 26) at 3-4)

On July 21, 2019, this Court dismissed Plaintiff's claims for (1) sex discrimination under Title VII, the NYSHRL, and the NYCHRL; (2) FMLA violations; and (3) assault, negligence, and breach of contract.  (July 21, 2019 Order (Dkt. No. 52) at 13)

On September 1, 2020, Defendants Montefiore, Mack, Crute, and Leung (the "Moving Defendants") moved for summary judgment on Plaintiff's claims of race, national origin, and religious discrimination under Title VII, 42 U.S.C. § 1981, the NYSHRL, and the

NYCHRL, all of which are premised on a theory of hostile work environment; and Plaintiff's

retaliation claims under Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL.[1]  (See

Mot. (Dkt. No. 91))

The Moving Defendants' motion for summary judgment will be granted as set

forth below.

I.    **BACKGROUND**

A.    **The Parties**

Defendant Montefiore, located in the Bronx, "is a comprehensive non-profit

medical center, which includes several hospitals, a network of neighborhood health centers, and

a wide range of ambulatory specialty, home health care and rehabilitation services." (Def. R.

56.1 Stmt. (Dkt. No. 92) ¶ 1)[2]  At all relevant times, Montefiore maintained policies against

discrimination, harassment, and retaliation.  (Id. ¶ 2)

Plaintiff describes herself as a "53-year-old Afro-Dominican woman born in the

United States." (Am. Cmplt. (Dkt. No. 26) at 8)  The Court thus understands that her race is

---

[1]  Defendant Reille is no longer a party to this case, because the Court dismissed all of Plaintiff's claims against him.  (See July 21, 2019 Order (Dkt. No. 52) at 13)  Defendant Rodriguez has not appeared in this case, despite having been served on June 26, 2018.  (See (Dkt. No. 11))
[2]  To the extent that this Court relies on facts drawn from the Defendants' Local Rule 56.1 statement and Plaintiff's response to Defendants' Local Rule 56.1 statement, it has done so because the opposing party or parties have either not disputed the factual assertions or have not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); Local Civ. R. 56.1(d) ("Each statement by the movant or opponent . . . , including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."). Where Plaintiff disagrees with Defendants' characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) ("In ruling on a motion for summary judgment, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.").

African American and Hispanic.  Plaintiff "actively practice[es] as a Jehovah's Witness," having

converted to that religion in 2013.  (Id. at 8-9; Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 3)  Montefiore

employed Plaintiff for twenty-three years – from 1995 until 2018.  (Pltf. Resp. R. 56.1 Stmt.

(Dkt. No. 105) ¶ 4)  Between 2008 and 2018, Plaintiff worked as a senior clerk typist in

Montefiore's Home Care department.  (Id. ¶ 5)

Between 2008 and 2017, Defendant Diane Rodriguez was Plaintiff's supervisor.

(Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 6; see also Reyes-Tutiven Decl. (Dkt. No. 95) ¶ 4; id., Ex. A

(Dkt. No. 95-1) at 13, 17)  Rodriguez is Caucasian and an actively practicing Christian.  (Def. R.

56.1 Stmt. (Dkt. No. 92) ¶ 7; Am. Cmplt. (Dkt. No. 26) at 8)  Following Rodriguez's retirement

in July 2017, Defendant Anthony Leung – Montefiore's Director of Information Systems –

supervised Plaintiff.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 8; Am. Cmplt. (Dkt. No. 26) at 8-9)

---

Where Defendants support their factual assertions with citations to the Amended Complaint and
Plaintiff has not disputed these statements, this Court has deemed those facts admitted.

Plaintiff's response to Defendants' Local Rule 56.1 Statement is styled as a declaration, and was
executed "under penalty of perjury."  (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 105) at 1, 16)
Accordingly, this Court has considered Plaintiff's response to Defendants' Local Rule 56.1
Statement to the extent that it is based on personal knowledge, even where Plaintiff has not cited
to other evidence. Cf. Dawson v. Long, No. 16 Civ. 1608 (GBD) (RWL), 2018 WL 5914859, at
*1 (S.D.N.Y. Aug. 20, 2018), report and recommendation adopted, 2018 WL 4519199 (S.D.N.Y.
Sept. 20, 2018) (citing 28 U.S.C. § 1746; Fed. R. Civ. P. 56(c)(4); Fitzgerald v. Henderson, 251
F.3d 345, 361 (2d Cir. 2001); Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)) (construing
pro se opposition to a motion for summary judgment "as an affidavit insofar as the statements
asserted therein are based on personal knowledge" because "[i]ts contents are declared to under
the penalty of perjury, and it is signed and dated").

Because "[a] Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are
otherwise unsupported in the record', . . . 'where the record does not support the assertions in a
Local 56.1 statement, those assertions [have been] disregarded and the record reviewed
independently.'" Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F.
Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov,
Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) (quoting Holtz v. Rockefeller & Co.,
Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

Leung is Asian American, and he is not a Jehovah's Witness.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 9)

Defendants Aretha Mack and Veronica Crute were Plaintiff's co-workers in Montefiore's Home Care department.  (Id. ¶¶ 10, 41)  Mack and Crute are African American, and they do not practice the Jehovah's Witness faith.  (Id. ¶ 11)  Mack was a senior clerk, and Crute was a senior clerk typist.  Both women were senior to Plaintiff in the Home Care department.  (Id. ¶¶ 10, 12, 41)

### B.  The Amended Complaint's Allegations of Discriminatory and Retaliatory Treatment

In the Amended Complaint, Plaintiff asserts that "[t]hroughout [her] employment, Defendants Rodriguez and Mack actively and consistently harassed, discriminated against and retaliated against" her, treatment she understood "to be a result of her Afro-Dominican heritage," and which worsened after she became a Jehovah's Witness.  (Am. Cmplt. (Dkt. No. 26) at 9)  According to Plaintiff, in the summer of 2014, Defendant Rodriguez told Plaintiff – in front of co-workers – "'I hate Dominicans because they play bachata music all night long and don't let me sleep.'"  (Id. at 10)  And in 2015, Rodriguez "repeatedly instructed [Plaintiff] that she was forbidden to speak Spanish to her colleagues . . . even on Plaintiff's own time, including in private conversations and on break."  Brown's Ecuadorian and Puerto Rican colleagues – with whom Plaintiff conversed in Spanish – were not told to stop speaking Spanish, however.  (Id.)

As to Plaintiff's religion, Plaintiff alleges that Defendant Rodriguez asked every December between 2013 and 2017 why she did not celebrate Christmas, and "did not ask similar questions of other practicing non-Christians."  (Id. at 12)  In December 2016, Rodriguez "sent each of Plaintiff's officemates wrapped gifts," but gave Plaintiff "a dirty green reusable shopping tote."  (Id. at 11)  The Amended Complaint goes on to allege that "[o]n at least six separate

4

occasions between 2015 and 2018, Defendant Mack said [to Plaintiff] 'please lord, get the

demons out of here,' 'you are Satan' and 'you are the devil.'" (Id. at 12)  In April 2017, Mack

told Plaintiff that she did not "want [Plaintiff] here." (Id.)  In December 2017, Plaintiff was

excluded from a photograph of the Home Care department, which she claims was part of the

office's holiday decorations. (Id. at 11)

        In the Amended Complaint, Plaintiff complains about the following additional

acts of allegedly discriminatory treatment committed by her supervisors and co-workers:

> (1) Supervisor Rodriguez "frequently rejected [Plaintiff]'s requests for personal
> leave while accepting or approving similar requests from [Plaintiff's] non[-
> ]Jehovah's [W]itness colleagues, including Defendants Mack and Crute," and in
> the winter of 2014 or 2015, Rodriguez told Plaintiff that Rodriguez "deliberately
> rejected [Plaintiff's] requests for personal leave in words to the effect of 'you . . .
> are the only one who I do not give personal leave to on short notice'";
>
> (2) in 2014, Supervisor Rodriguez "docked [Plaintiff]'s vacation time for time
> spent replacing her employee identification card at Montefiore's primary hospital
> premises, a practice that she did not apply to other non-Jehovah's Witness
> employees under her supervision";
>
> (3) in 2015 "and years prior," Supervisor Rodriguez "routinely chastised Plaintiff,
> without any proper basis, while failing to reprimand or chastise Defendant Crute
> for the same conduct related to returning from lunch at the same time";
>
> (4) between 2015 and 2018, Supervisor Rodriguez "refused to provide Plaintiff
> important training concerning software updates and procedures related, though
> Plaintiff is aware that Defendant Rodriguez did provide this training to non-Afro-
> Dominican, non-Jehovah's Witness employees, including Defendants Mack and
> Crute";
>
> (5) In August 2016, Supervisor Leung coded Plaintiff's time off for "a specialist
> medical appointment on an emergency basis" as vacation time, not sick time.
> According to Plaintiff, "no non[-]Jehovah's Witness employees ever had
> medical/sick time treated as vacation time";
>
> (6) in December 2017, Supervisor Leung "reprimanded" Plaintiff "for using a
> misting humidifier and peppermint oil," but did not reprimand any other
> employees for spraying perfumes, room fresheners, or other fragrance devices;
>
> (7) In January 2018, Co-worker Mack "directed Plaintiff not to communicate with
> temporary staff working in [Plaintiff]'s division on any topic." According to

Plaintiff, Mack "never told any non-J[e]hovah's Witness, non-Afro-Dominican employees not to talk to temporary employees";

(8) in January 2018, Co-worker Mack "threatened [Plaintiff] in direct response to a complaint [Plaintiff] made to Defendant Leung concerning Defendant Mack's harassing and illegally discriminatory directives," by saying "words to the effect of: 'keep it up – you are going to see what is going to happen to you'";

(9) Between January and February 2018, Co-worker Mack "repeatedly took phone messages for Plaintiff in her absence but failed to pass those messages on to Plaintiff," and "told Defendant Leung that Plaintiff was not performing her duties, causing Defendant Leung to reprimand Plaintiff." According to Plaintiff, "Defendant Mack did not withhold telephone messages from any other employee"; and

(10) In February 2018, Co-worker Crute "threatened Plaintiff with physical harm, after Plaintiff had let Defendant Leung know that Defendant Crute had been making a personal phone call," and "in a menacing tone and standing in an aggressive and intimidating posture, pointed at [Plaintiff] and yelled words to the effect of: 'You'll see. You're going to get yours.'"

(Id. at 10-13)

The Court construes Plaintiff's allegations to raise hostile work environment claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL, based on her race, national origin, and religion.[3]

---

[3] In her form Amended Complaint, Plaintiff checks boxes for employment discrimination claims under Title VII, premised on her race, national origin, and religion; 42 U.S.C. § 1981, premised on her "Dominican" race; and the NYSHRL and NYCHRL. (Am. Cmplt. (Dkt. No. 26) at 3-4) She also checks a box for an FMLA claim, and lists tort and breach of contract claims (id. at 4), but these claims have been dismissed. (See July 21, 2019 Order (Dkt. No. 52) at 13) Plaintiff states that her race is "Afro-Dominican." (Am. Cmplt. (Dkt. No. 26) at 8)

Under "Adverse Employment Action," Plaintiff checks boxes for "did not promote me," "provided me with terms and conditions of employment different from those of similar employees," "retaliated against me," "harassed me or created a hostile work environment," and added: "sexually harassed me, permitted an assault to be committed against me, refused to address conduct contrary to [Montefiore]'s policies." (Id. at 5) Plaintiff's claims that she was not promoted, and that she was sexually harassed, were dismissed with Plaintiff's sex discrimination claims. (See July 21, 2019 Order (Dkt. No. 52) at 13; May 8, 2019 Report & Recommendation ("R&R") (Dkt. No. 47) at 10-13)

With respect to her retaliation claim, Plaintiff alleges that, in January 2018, "Defendant Mack threatened [Plaintiff] in direct response to a complaint [Plaintiff] made to Defendant Leung concerning Defendant Mack's harassing and illegally discriminatory directives." (Id. at 12)  Plaintiff further alleges that, in February 2018, "Supervisors ignored threats to Plaintiff's personal safety."  In particular, "Defendant Leung was present when Defendant Crute threatened Plaintiff [with physical harm, after Plaintiff reported to Leung that Crute made a personal phone call] and took no action to deescalate the situation or reprimand Defendant Crute's behavior." (Id. at 13)   Plaintiff alleges that she "made a complaint concerning Defendant Crute's assault upon her to . . . Montefiore's human resources department," and that, in response, Montefiore moved Plaintiff to another location "to prevent Plaintiff from having to interact with Defendant Crute."  According to Plaintiff, "Plaintiff still frequently saw Defendant Crute during the course of her work day," and "Plaintiff felt very distressed and nervous about Defendant Crute's hostility, and Montefiore's failure to take more steps to protect Plaintiff from Defendant Crute." (Id.)

The Court construes the Amended Complaint to raise retaliation claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL.  Plaintiff contends that she complained to Defendant Leung and to Montefiore's human resources and compliance departments about alleged discrimination, and suffered retaliation as a result.

---

In the Amended Complaint, Plaintiff also asks the Court to "direct the defendant to reasonably accommodate my disability." (Am. Cmplt. (Dkt. No. 26) at 6)  Plaintiff did not check any box indicating an employment discrimination claim based on a disability, however; nor does the Amended Complaint contain allegations supporting a disability claim.  (See id. at 4, 8-14)  Accordingly, Plaintiff cannot seek relief based on disability discrimination.

### C.    Plaintiff's Complaints to Montefiore
###       About Her Supervisors and Co-Workers

Between 2015 and 2018, Plaintiff complained to Montefiore's human resources
and compliance departments about Rodriguez, Leung, and Mack's conduct.  (See Reyes-Tutiven
Decl., Exhs. A-B (Dkt. Nos. 95-1, 95-2))

On December 8, 2015, for example, Brown complained via Montefiore's
compliance hotline,[4] stating that Rodriguez had directed someone to leave a canvas bag on
Plaintiff's desk in lieu of a Christmas present.  According to Brown, Rodriguez gave her the bag
even though she knew that Plaintiff is a Jehovah's Witness and does not celebrate Christmas.
(Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 55; see also Reyes-Tutiven Decl., Ex. B (Dkt. No. 95-2))
When Todd Austin, an Employee Relations Manager in Montefiore's Employee and Labor
Relations department investigated Plaintiff's complaint, Rodriguez stated that she left the canvas
bag as a gift, and that she knew Plaintiff did not accept Christmas presents due to her religion.
(Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 56; see also Reyes-Tutiven Decl., Ex. B (Dkt. No. 95-2) at 5-
11)  Austin instructed Leung to review with Rodriguez Montefiore's policy prohibiting religious
discrimination.  Such counseling is a form of employee discipline at Montefiore.  (Def. R. 56.1
Stmt. (Dkt. No. 92) ¶ 56; see also Reyes-Tutiven Decl., Ex. B (Dkt. No. 95-2) at 7, 9)

On July 28, 2016, Plaintiff complained via Montefiore's compliance hotline,
stating that while both Brown and Mack were "fil[ing] some papers" that day, Mack
"approached [her] and asked if [Brown] could look in the pendaflex for [a] file [Mack needed]."
Brown stated that she felt that Mack was "purpose[fully] doing this and not allowing [Brown] to
complete her work."  Brown complained that she "doesn't think it's fair that [Mack] can keep

---

[4]  It is not clear from the record whether someone calling the Montefiore compliance hotline
leaves a message or speaks with a Montefiore employee.

invading her space whenever [Mack] sees fit." Brown also complained to Rodriguez about Mack's behavior. In response, and on that same day, Rodriguez held a meeting with "the staff" at which she "acknowledged [Mack]'s actions, which upset [Mack]." After the meeting, "[Mack] kept making sarcastic comments about the issue," and "[Mack]'s behavior made [Brown] upset[,] so [Brown] asked [Rodriguez] if she could leave [for the day]." Rodriguez "became irate" but eventually permitted Brown to leave. (Reyes-Tutiven Decl., Ex. A (Dkt. No. 95-1) at 3)

On March 3, 2017, Brown complained via Montefiore's compliance hotline, stating that, "[f]or a significant amount of time, [Rodriguez] and [Leung] have not behaved as the ideal managers." Brown complained that Rodriguez had a "tendency to hold [Brown] to a different standard than [Mack]" by "allow[ing] [Mack] to engage in non-work related tasks, and . . . fail[ing] to hold [Mack] accountable for her unprofessional outburst." Brown complained that Rodriguez "vent[ed] to [Mack] about [Brown] causing [Mack] to feel as if [Brown] is responsible for matters taking place at the facility. It also seems that [Rodriguez] informs [Mack] of [Brown]'s concern," which is a "confidentially violation [that] causes animosity between [Mack] and [Brown]." Brown stated that "[i]t is obvious that [Leung] is aware of the matters taking place, but [Leung] refuses to investigate matters or speak with the parties involved. It appears that [Leung] believes exactly what [Rodriguez] tells him although her information may be inaccurate or biased." (Id. at 7)

Brown further complained that

[o]n March 2, 2017, there was a meeting when the policies were reiterated with the staff. Following the meeting, [Mack] made remarks about getting the demons out of the facility. [Mack] was implying that [Brown] was an instigator and needed to leave the organization. During the shift on March 3, [Mack] made an antagonizing remark as she always does. While appearing irate and going on a loud rant, [Mack] said something to the extent of getting rid of the demons.

9

[Rodriguez] pulled [Mack] into the office and spoke with her as [Rodriguez] always does although it is evident that speaking with [Mack] is not a permanent solution. [Brown] sent [Rodriguez] an email speaking about the outburst and explained that the staff overheard the incident. [Brown] explained that she hoped that [Rodriguez] took appropriate action. A few moments later, [Rodriguez] advised the staff that there would be a meeting at 11:00am.

During the meeting, [Leung] reiterated the policies as he did on March 2. [Leung] spoke about the incident that took place with [Mack] without stating anyone's name. The meeting concluded with the employees signing attendance documents and a document stating that they received an employee manual. As the employees prepared to leave, [Rodriguez] said something . . . relatively close to, "Well some people like to antagonize the employee and remain calm when the other employee is upset." At this point, [Brown] requested to meet with [Leung] personally. [Brown] explained that [she] was not to blame for [Mack]'s ongoing outbursts. [Brown] explained that she felt as if she was being retaliated against and made to be an instigator for bring[ing] [the] matter to the compliance department's attention. As [Brown] expressed her frustrations, [Leung]'s demeanor made it appear as if he was nonchalant and did not want to address the matter. Following the meeting, [Leung] sent an email advising the employees that he and [Rodriguez] had a zero tolerance towards both parties involved in altercations. Again, it appeared that [Leung] and [Rodriguez] were blaming [Brown].

(Id.)

On January 25, 2018, Plaintiff complained via Montefiore's compliance hotline alleging that, "[s]ince approximately eight years ago, [Rodriguez] and [Mack] have been harassing [her] at the workplace that has caused a consistent and hostile and stressful working environment." Brown complained that Rodriguez "would call [Brown] inappropriate names, such as 'Queen Bathsheba[,]'[] and has discriminated [against] [Brown] [by] not providing scheduling privileges that are provided to others." Brown further stated that Mack "will act unprofessional[ly] toward [Brown] [by using] verbal threats, improper innuendoes and speech designed to antagonize [Plaintiff]," and that, on January 23, 2018, Mack "antagonized [Brown] by consistently mentioning rude innuendos about [Brown] to [Brown], while also in the presence of other co-workers." Brown added that "[Leung] threatens [that Brown] will lose her job if she doesn't get along with [Mack] and her behavior." (Id. at 13, 17)

In February 2018, Plaintiff complained to Leung that Crute had made a personal call at work. Crute then threatened Plaintiff stating, "'you're going to get yours.'" (Schmidt Decl., Ex. A ("Pltf. Dep.") (Dkt. No. 121-1) at 37-38)

Montefiore's human resources and compliance departments investigated Plaintiff's complaints about her supervisors and co-workers and concluded that all of Plaintiff's complaints were unsubstantiated, except for her December 8, 2015 complaint alleging that Rodriguez gave Brown a "dirty green canvas bag" as a Christmas gift. Rodriguez admitted that she had given Brown the canvas bag. (See Reyes-Tutiven Decl., Ex. A (Dkt. No. 95-1) at 4-5, 8-9, 19; id., Ex. B (Dkt. No. 95-2) at 4, 6-7, 9) As discussed above, as a result of Brown's complaint, a Montefiore employee relations manager directed Leung to review with Rodriguez Montefiore's policy prohibiting religious discrimination. (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 56; Reyes-Tutiven Decl., Ex. B (Dkt. No. 95-2) at 7-11)

Plaintiff eventually requested that her work station be moved.[5] Montefiore granted Plaintiff's request, and by June 24, 2018, her work station had been moved to a location different from that of her co-workers. (See Pltf. R. 56.1 Stmt. (Dkt. No. 105) ¶ 50; Reyes-Tutiven Decl., Ex. A (Dkt. No. 95-1) at 19; Pltf. Dep. (Dkt. No. 121-1) at 39)

## II.   PROCEDURAL HISTORY

On March 28, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (See Beltre Affirmation, Ex. A (Dkt. No. 35-1)) She received a right-to-sue letter on April 17, 2018. (See Am. Cmplt. (Dkt. No. 26) at 15)

The Complaint was filed on April 17, 2018, and asserts claims under Title VII, the NYCHRL, and state law for "harassment and violence workplace." The Complaint names as

---

[5] The record does not disclose when Brown requested that her work station be moved.

Defendants Montefiore Medical Center, Diane Rodriguez, Aretha Mack, Veronica Crute, Anthony Leung, and Russell Reille.  (Cmplt. (Dkt. No. 2) at 4-5)

On August 20, 2018, Defendants Montefiore, Mack, Crute, and Reille moved to dismiss, and on August 23, 2018, this Court referred the motion to Magistrate Judge Katharine Parker.  (Mot. (Dkt. No. 15); Order of Reference (Dkt. No. 20))  On August 27, 2018, Plaintiff sought leave to file an amended complaint.  (Aug. 27, 2018 Pltf. Ltr. (Dkt. No. 21))  Defendants Montefiore, Mack, Crute, and Reille informed Judge Parker that they did not oppose Plaintiff's request to amend.  (Sept. 18, 2018 Def. Ltr. (Dkt. No. 23))  Accordingly, Judge Parker terminated the motion to dismiss, and directed Plaintiff to file an amended complaint by September 28, 2018.  (See Order (Dkt. No. 24))

Plaintiff filed the Amended Complaint on September 28, 2018.  (Am. Cmplt. (Dkt. No. 26))  The Amended Complaint alleges discrimination on the basis of race, nationality, religion, and sex, in violation of Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL; violation of the FMLA; and breach of contract, assault, and negligence.  (Id. at 3-4)  Defendants Montefiore, Mack, Crute, Leung, and Reille moved to dismiss all claims other than Plaintiff's Section 1981 claims.  (Mot. (Dkt. No. 34))  Plaintiff filed an untimely opposition letter (Mar. 26, 2019 Pltf. Opp. Ltr. (Dkt. No. 43)), which Judge Parker considered over Defendants' objection. (Apr. 10, 2019 Order (Dkt. No. 45))

On May 8, 2019, Judge Parker issued an R&R, recommending that Defendants Montefiore, Mack, Crute, Leung, and Reille's motion to dismiss be granted in part and denied in part.  (R&R (Dkt. No. 47) at 27)  Judge Parker recommended that Plaintiff's claim for sex discrimination under Title VII be dismissed with prejudice; Plaintiff's claim for sex discrimination under the NYSHRL and the NYCHRL be dismissed without prejudice; Plaintiff's

FMLA claim be dismissed without prejudice; and that Plaintiff's state law claims for breach of contract, negligence and assault be dismissed with prejudice. Judge Parker further recommended that Plaintiff's Title VII claims against Defendants Mack, Crute, Leung, and Reille be dismissed with prejudice. Finally, Judge Parker recommended that Defendants' motion be denied with respect to Plaintiff's claims for hostile work environment and retaliation arising from race, national origin, and religious discrimination under Title VII, the NYSHRL, and the NYCHRL. (Id. at 13-21, 27-28)

On May 22, 2019, Defendants Montefiore, Mack, Crute, and Reille filed objections to Judge Parker's R&R. (Obj. (Dkt. No. 50))

On July 22, 2019, this Court adopted Judge Parker's R&R in its entirety. (July 22, 2019 Order (Dkt. No. 52) at 13) This Court further provided that any motion for leave to file a Second Amended Complaint was to be served and filed by August 12, 2019. (Id. at 13) Plaintiff did not file any motion for leave to file a Second Amended Complaint, and the case proceeded to discovery.

On September 1, 2020, Defendants Montefiore, Mack, Crute, and Leung moved for summary judgment on Plaintiff's remaining claims. (Mot. (Dkt. No. 91)) Brown filed her opposition on November 2, 2020 (Pltf. Opp. (Dkt. No. 105)), and Defendants Montefiore, Mack, Crute, and Leung filed a reply on November 20, 2020. (Reply (Dkt. No. 106))

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480

F.3d 140, 145 (2d Cir. 2007)).  "When no rational jury could find in favor of the nonmoving

party because the evidence to support its case is so slight, there is no genuine issue of material

fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd.

P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114

(2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is not in

itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes

a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"  Yi Fu Chen v. Spring Tailor,

L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in

original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

        In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . .  [M]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593

F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v.

Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  Moreover, "'[t]he principles governing

admissibility of evidence do not change on a motion for summary judgment[,]' and district

courts need only consider admissible evidence in ruling on a motion for summary judgment."

14

I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

Pro se submissions are "construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis omitted) (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)). A pro se litigant must, however, still 'meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Recs., 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks and citation omitted).

"In cases based on allegations of [discrimination and] discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'" Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).

However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (omission in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts[.]' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown, 257 F.3d at 252 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Mere conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of

material fact." Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also

Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) (quoting Holcomb v. Iona Coll., 521

F.3d 130, 137 (2d Cir. 2008); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005))

("'[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory

allegations to resist a motion for summary judgment' . . . [and the] 'nonmoving party must offer

some hard evidence showing that [her] version of the events is not wholly fanciful.'").

### B.   **Hostile Work Environment Claims**

In order to establish a hostile work environment claim under Title VII, Section

1981, and the NYSHRL, "'a plaintiff must show that "the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment."'"[6] Grewal

---

[6] In August 2019, the NYSHRL was amended to provide that it "shall be construed liberally for
the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights
laws, including those laws with provisions worded comparably to the provisions of [the
NYSHRL], have been so construed." N.Y. Exec. Law § 300. Accordingly, for claims that
accrued after this amendment went into effect, see S. 6577, 242d Leg. § 16(d) (N.Y. 2019), "'the
standard for [NYSHRL discrimination] claims [is] closer to the standard of the
NYCHRL.'" Edelman v. NYU Langone Health Sys., No. 21 Civ. 502 (LGS), 2022 WL
4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (second alteration in original) (quoting Livingston v.
City of New York, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)).

This amendment does not affect Brown's NYSHRL claims. "'[A] cause of action for
discrimination under the NYSHRL accrues and the limitation period begins to run on the date of
the alleged discriminatory act.'" Syeed v. Bloomberg L.P., 568 F. Supp. 3d 314, 321 (S.D.N.Y.
2021) (alteration in original) (quoting Fair Hous. Just. Ctr., Inc. v. JDS Dev. LLC, 443 F. Supp.
3d 494, 504 (S.D.N.Y. 2020)). Brown's claims are premised on conduct that took place between
2013 and 2018. (See Am. Cmplt. (Dkt. No. 26) at 8-13) Courts have concluded that the
effective date of N.Y. Exec. Law § 300 is either August 12, 2019 (the signing date) or October
11, 2019 (the date other parts of the omnibus bill containing the amendment take
effect). Compare McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 68 (S.D.N.Y.
2020) (citing S. 6577, 242d Leg. § 16 (N.Y. 2019)) ("The amendment took effect on the signing
date, August 12, 2019, although other parts of the omnibus bill containing it took effect on
October 11, 2019.") and Edelman, 2022 WL 4537972, at *14 (stating that the "effective date of"
N.Y. Exec. Law § 300 is "August 12, 2019"), with Livingston, 563 F. Supp. 3d at 232 n.14

v. Cuneo Gilbert & LaDuca LLP, No. 13 Civ. 6836 (RA), 2017 WL 1215752, at *11 (S.D.N.Y.

Mar. 31, 2017) (quoting Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015);

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))) (Title VII and NYSHRL); see also Johnson

v. IAC/Interactive Corp., 2 F. Supp. 3d 504, 516 (S.D.N.Y. 2014) (Section 1981). "'This

standard has both objective and subjective components: the conduct complained of must be

severe or pervasive enough that a reasonable person would find it hostile or abusive, and the

victim must subjectively perceive the work environment to be abusive.'" Grewal, 2017 WL

1215752, at * 11 (quoting Littlejohn, 795 F.3d at 321). "'[I]t is axiomatic that the plaintiff must

show that the hostile conduct occurred because of a protected characteristic[, however.]'" Id.

(quoting Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)).

   Moreover, "[a]s a general rule, incidents must be more than 'episodic; they must

be sufficiently continuous and concerted in order to be deemed pervasive.'" Tolbert, 790 F.3d at

439 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). "[A] plaintiff alleging a

hostile work environment 'must [thus] demonstrate either that a single incident was

extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted"

to have altered the conditions of her working environment.'" Alfano, 294 F.3d at 374 (quoting

Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000); Perry v. Ethan Allen, Inc., 115

F.3d 143, 149 (2d Cir. 1997)). "'The fact that the law requires harassment to be severe or

pervasive before it can be actionable does not mean[, however,] that employers are free from

---

(citing Wellner v. Montefiore Med. Ctr., No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4
(S.D.N.Y. Aug. 29, 2019)) ("These amendments were signed into law by then-Governor Andrew
Cuomo on or about August 12, 2019. Significantly, however, these amendments only apply to
claims that accrue on or after the effective date of October 11, 2019."). Accordingly, Plaintiff's
hostile work environment and retaliation claims accrued before the amendments to the
NYSHRL, and her Title VII, Section 1981, and NYSHRL claims are all subject to the same
standard.

liability in all but the most egregious of cases,'" Whidbee v. Garzarelli Food Specialties, Inc.,
223 F.3d 62, 70 (2d Cir. 2000) (quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997)), and
the Second Circuit has "cautioned against setting the bar too high." Terry v. Ashcroft, 336 F.3d
128, 148 (2d Cir. 2003).

  "In assessing whether a plaintiff has met her burden, 'courts should examin[e] the
totality of the circumstances, including:  the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with the victim's [job] performance.'" Belton v. City of New
York, No. 12 Civ. 6346 (JPO), 2014 WL 4798919, at *8 (S.D.N.Y. Sept. 26, 2014) (alterations
in original) (quoting Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir.
2014)).

  "Under the NYCHRL, there are not separate standards for 'discrimination' and
'harassment' claims; rather, 'there is only the provision of the law that proscribes imposing
different terms, conditions and privileges of employment based [on a protected characteristic].'"
Clarke v. InterContinental Hotels Grp., PLC, No. 12 Civ. 2671 (JPO), 2013 WL 2358596, at *11
(S.D.N.Y. May 30, 2013) (quoting Sotomayor v. City of New York, 862 F. Supp. 2d 226, 261
(E.D.N.Y. 2012).  In order to prevail on a discrimination claim or a hostile work environment
claim under the NYCHRL, a plaintiff "'need only demonstrate by a preponderance of the
evidence that she has been treated less well than other employees' because of a protected trait."
Johnson v. Strive E. Harlem Emp. Grp., 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (quoting
Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013).  That is,
"the plaintiff need only show differential treatment – that she is treated 'less well' – because of a
discriminatory intent." Mihalik, 715 F.3d at 110.  "The NYCHRL imposes liability for harassing

conduct that does not qualify as 'severe or pervasive,' and 'questions of "severity" and

"pervasiveness" are applicable to consideration of the scope of permissible damages, but not to

the question of underlying liability.'" Bermudez v. City of New York, 783 F. Supp. 2d 560, 579

(S.D.N.Y. 2011) (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 76 (1st Dept. 2009)).

"When applying this standard, however, district courts must be mindful that the NYCHRL is not

a 'general civility code.'" Mihalik, 715 F.3d at 110 (quoting Williams, 61 A.D.3d at 79).

    **C.**    **Retaliation Claims**

        Retaliation claims under Title VII, Section 1981, the NYSHRL and the NYCHRL

"are . . . governed by the . . . burden-shifting framework" set forth in McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973). Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 69

(S.D.N.Y. 2016) (Title VII, Section 1981, and NYSHRL); see also Malena v. Victoria's Secret

Direct, LLC, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (NYSHRL and NYCHRL). Under the

McDonnell Douglas framework, Plaintiff "bears the initial burden of establishing a prima facie

case of discrimination." Holcomb, 521 F.3d at 138.

> To establish a prima facie case of retaliation under the NYSHRL, as under federal
> employment anti-discrimination law, a plaintiff-employee must show that (1) she
> engaged in protected activity; (2) the employer was aware of this activity; (3) the
> employer took adverse action against the employee; and (4) a causal connection
> exists between the protected activity and the adverse action.

Malena, 886 F. Supp. 2d at 361-62 (citing Dumay v. City of New York, No. 09 Civ. 6866

(NRB), 2011 WL 4901311, at *8-9 (S.D.N.Y. Oct. 14, 2011)). "If the plaintiff establishes a

prima facie case, the defendant has the burden of articulating a legitimate, non-retaliatory reason

for the conduct, whereupon the burden shifts back to the plaintiff to introduce evidence

disproving the legitimate reason offered by the defendant." Dumay, 2011 WL 4901311, at *8.

        "A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited

discrimination.'" Kouakou v. Fideliscare New York, 920 F. Supp. 2d 391, 400 (S.D.N.Y. 2012)

(alterations in original) (quoting Cruz, 202 F.3d at 566). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) (citing Dinice-Allen v. Yale-New Haven Hosp., No. 3:06 Civ. 00675 (PCD), 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008)); see also Santucci v. Veneman, No. 01 Civ. 6644 (CBM), 2002 WL 31255115, at *3 (S.D.N.Y. Oct. 8, 2002) (emphasis omitted) ("[I]f the conduct complained of by the plaintiff had nothing to do with race, color, religion, sex, or national origin, an action [for retaliation] cannot be maintained under Title VII.").

    "To show an adverse employment action in the retaliation context, a plaintiff must demonstrate that the challenged action was 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Adams v. City of New York, 837 F. Supp. 2d 108, 121-22 (E.D.N.Y. 2011) (alteration in original) (quoting Hicks, 593 F.3d at 162). "Unlawful retaliation is therefore not limited to 'actions that affect the terms and conditions of employment.'" Id. (quoting Hicks, 593 F.3d at 162).

    "A causal connection between the protected activity and the adverse action may be demonstrated by showing '(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities.'" Elhanafy v. Shinseki, No. 10 Civ. 3192 (JG) (JMA), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (alteration in original) (quoting Ashok v. Barnhart, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003)). "Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a prima facie case." Aka v. Jacob K.

Javits Convention Ctr. of N.Y., No. 09 Civ. 8195 (FM), 2011 WL 4549610, at *9 (S.D.N.Y.

Sept. 30, 2011) (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010)).

"'The [NY]CHRL is slightly more solicitous of retaliation claims than federal and

state law because, rather than requiring a plaintiff to show an "adverse employment action," it

only requires him to show that something happened that was "reasonably likely to deter a person

from engaging in protected activity."'" Malena, 886 F. Supp. 2d at 362 (alteration in original)

(quoting Rozenfeld v. Dep't of Design & Constr. of City of N.Y., 875 F. Supp. 2d 189, 208

(E.D.N.Y. 2012)).  "Otherwise, a prima facie case of retaliation faces the same requirements

under the NYCHRL as under the NYSHRL." Id. (citing Rozenfeld, 875 F. Supp. 2d at 208).

## II.    ANALYSIS

The Moving Defendants argue that "the material facts are not in dispute, and

those undisputed facts show that Plaintiff cannot establish that she was subjected to a hostile

work environment because of her race, national origin or religion and that she cannot show that

she was retaliated against because of her participation in any protected activity."  (Def. Br. (Dkt.

No. 93) at 6)  According to the Moving Defendants, "Plaintiff simply could not get along with

either her co-workers or her supervisors[, which] had nothing to do with her being Dominican or

a Jehovah's Witness."  (Id. at 8)

Plaintiff responds that she has "presented evidence that [D]efendants have shown

animus towards [her] because of [her] membership in a protected class," and that she "suffered

. . . adverse work events . . . due to [her] membership in the protected class."  (Pltf. Opp. (Dkt.

No. 105) at 25-26)

**A.**     **Hostile Work Environment Claim**

The Court considers below whether the alleged conduct of Supervisor Rodriguez, Supervisor Leung, Co-worker Mack, and Co-worker Crute created a hostile work environment for Brown.

**1.**     **Rodriguez's Conduct**

One day in the summer of 2014, Defendant Rodriguez came into the work space where Brown, Mack and Crute perform their duties.  Brown "believe[s] [that Rodriguez] said she was tired because she didn't get any sleep because, you know, ['I hate – I hate those Dominicans, they are always playing Bachata.[']"  (Pltf. Dep. (Dkt. No. 121-1) at 14)  Plaintiff testified that she "wouldn't dare" say anything in response to Rodriguez's statement, and that "this is the only statement that [she] can recall" from her twenty-three years of employment at Montefiore that "specifically referenced Dominicans."  (Id.)  Because Rodriguez only made this one statement referencing Dominicans, the incident is merely "episodic."  Moreover, Brown has not shown that this "'single incident was extraordinarily severe . . . [such that it] altered the conditions of her working environment.'"  See Tolbert, 790 F.3d at 439; Alfano, 294 F.3d at 374 (quoting Cruz, 202 F.3d at 570).  The statement was not made directly to Plaintiff, and it did not spur continued discussion or further statements by Rodriguez or Brown's co-workers.  (See Pltf. Dep. (Dkt. No. 121-1) at 14)

Accordingly, Rodriguez's remark is merely an "'offensive utterance'" that was not physically threatening or humiliating, and did not unreasonably interfere with Plaintiff's job performance.  See Belton, 2014 WL 4798919, at *8 (quoting Rivera, 743 F.3d at 20).

Brown complains that Rodriguez "frequently rejected [Plaintiff's] requests for personal leave while accepting or approving similar requests from [Plaintiff's] non[-]Jehovah's [W]itness colleagues, including Defendants Mack and Crute."  For example, in the winter of

2014 or 2015, Rodriguez told Brown that she had "deliberately rejected . . . Brown's requests for personal leave in words to the effect of 'you . . . are the only one who I do not give personal leave to on short notice.'" (Am. Cmplt. (Dkt. No. 26) at 10-11)  It is undisputed, however, that under Montefiore's leave policies, requests for personal leave are granted only if there is adequate coverage for the employee's department during the requested time off, and that when two employees request the same time off, the more senior employee may have his or her request granted while the more junior employee may have his or her request denied.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶¶ 28-29)  Although Plaintiff alleges that Rodriguez granted the requests of individuals who were not Jehovah's Witnesses – in particular, Mack and Crute – (see Am. Cmplt. (Dkt. No. 26) at 10), Montefiore's policy provides that senior employees' requests for leave are given priority, and Mack and Crute were senior to Plaintiff.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 12)  Moreover, Brown does not identify specific instances in which her requests for leave were denied.  Finally, Brown has not offered evidence that – if Brown in fact rejected her leave requests – she did so because of Brown's race, national origin, or religion.

Brown further complains that in 2014 Rodriguez "docked [Plaintiff's] vacation time for time spent replacing her employee identification card at Montefiore's primary hospital premises, a practice that she did not apply to other non-Jehovah's Witness employees under her supervision." (Am. Cmplt. (Dkt. No. 26) at 11)  It is undisputed that (1) Montefiore employees must have their ID cards while they are at work; (2) employees are not be permitted to work until they secure an ID card; and (3) time spent securing an ID card is not considered work time and is coded as vacation or unpaid time.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶¶ 21-23)  Moreover, Plaintiff has not offered evidence that other employees in her department obtained new ID cards, much less evidence that Rodriguez did not dock the vacation time of other employees who had to

obtain new ID cards.  While Plaintiff testified that she spoke "to someone who is an employee at

Montefiore" – but who did not work in the Home Care department – who told her that he or she

was not docked vacation time for time spent replacing an ID card, this is inadmissible hearsay.

Moreover, Brown could not specify this employee's name, race, or religion.  (Id. ¶ 26; Pltf. Dep.

(Dkt. No. 121-1) at 25)  In sum, there is no evidence that Rodriguez – by docking Brown's

vacation time for time spent obtaining a replacement ID card – discriminated against her based

on any protected characteristic.

Brown further claims that in 2015 "and years prior," Rodriguez "routinely

chastised Plaintiff, without any proper basis, while failing to reprimand or chastise Defendant

Crute for the same conduct related to returning from lunch at the same time."  (Am. Cmplt. (Dkt.

No. 26) at 10)  Crute has submitted a declaration stating that "[o]n occasions when [Plaintiff] and

[Crute] returned late from [their] lunch break, . . . Rodriguez[] would counsel [Crute]," and that

"[Plaintiff] was not present when . . . Rodriguez counseled [Crute] about being late."  (Crute

Decl. (Dkt. No. 98) ¶ 2)  Plaintiff testified, however, that she and Crute "discussed" the fact that

Rodriguez spoke with Plaintiff about not returning on time from lunch, but did not speak with

Crute.  (Pltf. Dep. (Dkt. No. 121-1) at 17)  To the extent that Rodriguez counseled Brown – but

not Crute – about the need to return from lunch on time, Plaintiff has not offered evidence that

Rodriguez did so because of Brown's race, national origin, or religion.

Brown complains that, in 2015, Rodriguez asked Brown not to speak Spanish

with other employees during work hours, including during breaks.  (Am. Cmplt. (Dkt. No. 26) at

10)  It is undisputed that Montefiore has a policy that prohibits employees from speaking a

foreign language during work hours, except when employees are on a break.  (Def. R. 56.1 Stmt.

(Dkt. No. 92) ¶ 13)  It is also undisputed that Rodriguez asked Plaintiff not to speak Spanish

during work hours.  (Id. ¶ 14)  Although Plaintiff testified that Rodriguez also asked Plaintiff not

to speak Spanish to her co-workers when she was on a break (Pltf. Dep. (Dkt. No. 121-1) at 13-

14), Plaintiff further testified that Rodriguez did not tell any other employee not to speak Spanish

"in [her] presence," and "ha[s] no idea" why Rodriguez "singled [her] out."  (Id. at 14)  Having

testified that she "ha[s] no idea" why Rodriguez "singled [Brown] out," Plaintiff has not

demonstrated that Rodriguez treated her differently from any other employees based on her race,

national origin, or religion.

   Brown claims that, between 2015 and 2018, Rodriguez "refused to provide

Plaintiff important training concerning software updates and procedures related [to those

updates]."  "Defendant Rodriguez did provide this training to non-Afro-Dominican, non-

Jehovah's Witness employees, including Defendants Mack and Crute."  (Am. Cmplt. (Dkt. No.

26) at 10)  It is undisputed that Plaintiff missed certain training sessions because she was late or

absent from work on the days that the training sessions were conducted.  (Def. R. 56.1 Stmt.

(Dkt. No. 92) ¶ 18)  Moreover, Plaintiff testified that "[she] got the main training, but when there

were updates, . . . Rodriguez would huddle with [Crute] and [Mack] in the corner[,] and

[Plaintiff] was . . . absent from the [discussion]," and Rodriguez "didn't invite [Plaintiff to

participate]."  (Pltf. Dep. (Dkt. No. 121-1) at 15-16)  Plaintiff has not offered evidence as to why

Rodriguez did not invite her to participate in discussions regarding software updates.  Moreover,

Plaintiff testified that she never asked to be included in these discussions.  (Id. at 16)  Given

these circumstances, this incident does not demonstrate that Rodriguez treated Plaintiff

differently because of her race, national origin, or religion.

   Finally, Brown complains that Defendant Rodriguez asked her every December

between 2013 and 2017 why she did not celebrate Christmas.  Rodriguez "did not ask similar

questions of other practicing non-Christians." Moreover, in December 2016, Rodriguez "sent each of Plaintiff's officemates wrapped gifts," but gave Plaintiff "a dirty green reusable shopping tote." (Am. Cmplt. (Dkt. No. 26) at 11-12)

Plaintiff testified that she "do[es]n't celebrate Christmas," and "do[es]n't receive gifts on Christmas." Brown did not look inside the bag Rodriguez gave her, and "ha[s] no idea" whether it contained a gift. According to Plaintiff, "you can actually, even being a [Jehovah's] [W]itness, you can accept the gift, but they know that you don't celebrate it. You don't want to be rude." Brown testified that she "believe[s]" that Rodriguez "giving . . . a bag [with unknown contents to Brown] was meant to insult [Brown]," and "to insult specifically [her] religion." (Pltf. Dep. (Dkt. No. 121-1) at 26)

Brown's professed beliefs about Rodriguez's intent in giving her the tote bag are entirely speculative. She has offered no evidence that Rodriguez intended the bag as a Christmas gift, much less that Rodriguez intended to insult Brown's religion.

Plaintiff contends, however, that this incident "had to do with religion because it was Christmastime. And [Rodriguez] was out sick and she came in purpose[fully] to bring in those gifts. She was out sick." (Id. at 27) The mere fact that this incident occurred at "Christmastime," does not demonstrate that Rodriguez intended the tote bag as a Christmas gift, much less that Rodriguez's intent in giving Brown the tote bag was to insult Brown's religion.

As to the Amended Complaint's allegation that Rodriguez asked Brown every December why she did not celebrate Christmas (see Am. Cmplt. (Dkt. No. 26) at 12), Brown testified at her deposition that Rodriguez asked Brown this question only between 2013 and 2016. (Pltf. Dep. (Dkt. No. 121-1) at 28) According to Brown, Rodriguez would say "[b]asically the same thing [on each occasion], [']why don't you celebrate Christmas,[']

26

basically. It was simple. Same question around the same time." (Id. at 27) Little discussion

ensued. Brown testified that "there were moments that [Brown] did explain to [Rodriguez] why

[she did not celebrate Christmas] and there were moments that [Brown] referred [Rodriguez] to

JW.org so she can get a big scope." (Id.) Although Rodriguez allegedly asked Brown this

religion-related question once a year for several years, the Court concludes that Rodriguez's

conduct was not sufficiently severe or pervasive to alter the conditions of Plaintiff's

employment. See, e.g., Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 182

(E.D.N.Y. 2015) (finding five incidents over fourteen months "not sufficiently frequent to permit

a jury to plausibly find that they so severely permeated the work environment with intimidation,

insult and ridicule as to alter the terms and conditions of [p]laintiff's employment"); Pasic v.

Eztzi's Tex. Holding Corp., No. 01 Civ. 1114 (AGS), 2002 WL 31938854, at *3 (S.D.N.Y. Jan.

9, 2002) (finding five comments over thirteen months "insufficient to establish that [plaintiff]

suffered the kind of pervasive harassment necessary to pursue a hostile wo[r]k environment

claim"). And while Brown may have found Rodriguez's question annoying, Rodriguez's

conduct was not physically threatening or humiliating, nor has Plaintiff proffered evidence that

Rodriguez's conduct unreasonably interfered with Brown's job performance. See Belton, 2014

WL 4798919, at *8.[7]

---

[7] In the Amended Complaint, Brown also complains that in December 2017, she was excluded
from a photograph of the Home Care department staff, which was part of the office's holiday
decorations. (Am. Cmplt. (Dkt. No. 26) at 11) At her deposition, however, Brown admitted that
the "picture was not a holiday picture" and "was not a holiday decoration." (Pltf. Dep. (Dkt. No.
121-1) at 33) In any event, Brown has not offered evidence that she was excluded from the
photograph due to any protected characteristic, nor has she identified the supervisor or co-worker
allegedly responsible for excluding her from the photograph. Given these circumstances, this
incident does not constitute proof of unlawful discrimination by any named defendant.

### 2.    Leung's Conduct

Leung replaced Rodriguez as Brown's direct supervisor once Rodriguez retired in July 2017.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 8; Am. Cmplt. (Dkt. No. 26) at 8-9)  Brown complains that in August 2016, Leung coded Plaintiff's time off for a medical appointment as vacation time, instead of sick time.  Brown further complains that in December 2017, Leung "reprimanded" Plaintiff "for using a misting humidifier and peppermint oil," but did not reprimand other employees for their use of perfumes, room fresheners, or other fragrance devices.  (Am. Cmplt. (Dkt. No. 26) at 11)

It is undisputed, however, that Leung did not know Plaintiff's race, national origin, or religion during the time that she was employed at Montefiore.  (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 35)  "Under Second Circuit law, a plaintiff alleging discrimination on account of [her] protected status must offer evidence that a decision-maker was personally aware of [her] protected status to establish a prima facie case of discrimination."  Murray v. Cerebral Palsy Ass'ns of N.Y., Inc., No. 16 Civ. 662 (ER), 2018 WL 264112, at *7 (S.D.N.Y. Jan. 2, 2018) (citing Woodman v. WWOR-TV, Inc., 411 F.3d 69, 87-88 (2d Cir. 2005); Lambert v. McCann Erickson, 543 F. Supp. 2d 265, 278 n. 12 (S.D.N.Y. 2008)).  Because Leung did not know Plaintiff's race, national origin, or religion at the time of the conduct at issue, Plaintiff has not and cannot show that Leung's alleged "'hostile conduct occurred because of a protected characteristic.'"  See Grewal, 2017 WL 1215752, at * 11 (quoting Tolbert, 790 F.3d at 439).

### 3.    Mack's Conduct

In the Amended Complaint, Brown complains that, "[o]n at least six separate occasions between 2015 and 2018, Defendant Mack said [in Brown's presence] 'please lord, get

the demons out of here,' 'you are Satan' and 'you are the devil.'"   (Am. Cmplt. (Dkt. No. 26) at

12)  In April 2017, Mack told Brown that she did not "want [Brown] here."  (Id.)

      The evidence shows, however, that Mack "was not aware that [Plaintiff] is of the

Jehovah['s] Witness faith until [she] read the Complaint in this matter."  (Mack Decl. (Dkt. No.

97) ¶ 2)[8]  Accordingly, Mack's religion-related remarks to Brown cannot be viewed as

commentary on Brown's Jehovah's Witness faith.

      Indeed, according to Brown, Mack's references to Brown as "Satan" "was a

system that [Mack] had that any time [Brown] had a complaint in order to deflect, she got crazy,

she got upset."  (Pltf. Dep. (Dkt. No. 121-1) at 35)  Brown further testified that "[i]f [she]

complained to [Rodriguez] about a certain circumstance," Mack "came back at [Brown] with,

you know, it bothered her that [Brown] went and complained and said [her] piece . . . .  So

mostly every time [Brown] did that, [Mack] would come back and call [Brown] [']Satan.[']"

(Id.)  Accordingly, the evidence shows that Mack's remarks to Brown were in response to

Brown's complaints to Rodriguez about Mack, and were not commentary on Brown's religion.

      The evidence also shows that Mack's religion-related remarks were directed at

individuals other than Plaintiff.  Brown testified that she

> knew what [Mack calling her "Satan"] was about because [Mack] constantly
> talked – wanted always to impose her religion constantly – just talking out loud,
> constantly badgering about her religion, even to her family members over the
> phone.
>
> It was adamant that you had to follow her religion.  Adamant.  Screaming and
> yelling at the top of her head.

(Id. at 34)

---

[8]  Brown confirmed at her deposition that Mack "didn't specify" anything about the Jehovah's
Witness religion.  (Pltf. Dep. (Dkt. No. 121-1) at 34)

During her deposition, Brown testified that "[Mack] was calling [her] [']Satan[']" because [Brown] do[es]n't believe what [Mack] believes." (Id.) According to Brown, "[w]hen you don't follow a person and their beliefs and you don't do what they do, it's implied." (Id.) But this testimony is entirely speculative and conclusory, and cannot create a genuine issue of material fact. See Hicks, 593 F.3d at 166. In sum, there is no evidence that Mack's religion-related remarks to Brown were directed at Brown's Jehovah's Witness faith.

Brown further complains that in January 2018, Mack "directed Plaintiff not to communicate with temporary staff working in [their department] on any topic." (Am. Cmplt. (Dkt. No. 26) at 12) The evidence shows that "Mack instructed Plaintiff not to engage a temporary employee in conversation because[,] in her view, Plaintiff was distracting the temporary employee from doing her work." (Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 43) There is no contrary evidence.

At deposition, "Plaintiff admitted that she did not know why . . . Mack instructed her not to speak with the temporary employee." (Id. ¶ 44) Plaintiff asserts, however, that "[o]n many occasions throughout [her] employment in the Home Care Department, it bothered [Mack] that other coworkers enjoyed talking with [Plaintiff]. She[,] just like [Rodriguez], . . . demonstrated a despotic behavior toward [Plaintiff's] person. [Plaintiff's] mere existence seemed to bother them." (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 105) ¶ 43) Whatever the personality conflict between Brown and Mack, there is no evidence that Mack's direction that Brown not speak with the temporary employee was motivated by Brown's race, national origin, or religion.

In the Amended Complaint, Brown complains that in January 2018, Mack "threatened [her] in direct response to a complaint . . . Brown made to Defendant Leung

concerning Defendant Mack's harassing and illegally discriminatory directives." Mack allegedly said "words to the effect of: 'keep it up – you are going to see what is going to happen to you.'" (Am. Cmplt. (Dkt. No. 26) at 12)

At Brown's deposition, however, it emerged that Plaintiff's complaints to Leung were not premised on "illegal discrimination," but instead on Mack's alleged effort to exercise supervision over Brown's work activities.  Brown testified that she sent an email to Leung, copying Mack, in which she "explain[ed] that [Mack] is not [her] boss and [that Brown] do[es not] take directives from her."  (Pltf. Dep. (Dkt. No. 121-1) at 37)  Brown further testified that, after receiving her email, Leung spoke with Plaintiff about "[t]he directive[s]" that Mack had issued to Brown, and also spoke with Mack.  (Id.)  Brown testified that, after Leung's contact with Mack, "[Mack] said, [']Keep it up, you are going to see what's going to happen to you.['] Because [Plaintiff] went and . . . complained to [Leung]."  (Id.)  In sum, the evidence shows that the dispute between Brown and Mack arose from Mack's practice of telling Brown how to do her job.  Brown's complaints to Leung were not about illegal discrimination, but instead about Mack's effort to exercise control over Brown's work.

Finally, although Brown claims in the Amended Complaint that, between January and February 2018, Mack "repeatedly took phone messages for Plaintiff in her absence but failed to pass those messages on to Plaintiff," and "told Defendant Leung that Plaintiff was not performing her duties, causing Defendant Leung to reprimand Plaintiff" (Am. Cmplt. (Dkt. No. 26) at 11-12), Brown has not shown that Mack did so because of Brown's race, national origin, or religion.  Indeed, Plaintiff neither alleges nor testifies that Mack engaged in this conduct due to her race, national origin, or religion.  (See id.; Pltf. Dep. (Dkt. No. 121-1) at 33-34)

### 4.   Crute's Conduct

In the Amended Complaint, Brown asserts that in February 2018, Crute "threatened Plaintiff with physical harm, after Plaintiff had let Defendant Leung know that Defendant Crute had been making a personal phone call." "[I]n a menacing tone and standing in an aggressive and intimidating posture, [Crute] pointed at . . . Brown and yelled words to the effect of: 'You'll see.  You're going to get yours.'" (Am. Cmplt. (Dkt. No. 26) at 13)  Plaintiff has offered no evidence showing that Crute's "threat" was related to Plaintiff's race, national origin, or religion, however.  Instead, it is clear from the record that Crute's "threat" was in response to Plaintiff's report to Leung that Crute had made a personal phone call while at work. (See Pltf. Dep. (Dkt. No. 121-1) at 37-38)  Accordingly, Plaintiff has not shown that Crute engaged in any discriminatory conduct.

*          *          *          *

Plaintiff has not shown that she was subjected to a hostile work environment based on her race, national origin, or religion.  Accordingly, the Moving Defendants' motion for summary judgment on Plaintiff's Title VII, Section 1981, and NYSHRL claims will be granted.

### B.   Retaliation Claim

The Moving Defendants argue that "Plaintiff's retaliation claim should be dismissed because she cannot establish that she engaged in any protected activity."  (Def. Br. (Dkt. No. 93) at 20)  According to the Moving Defendants, "the only action that Plaintiff alleges was retaliatory was . . . Mack allegedly saying words to the effect of 'keep it up – you are going to see what is going to happen to you' after Plaintiff purportedly complained to . . . Leung regarding . . . Mack's allegedly harassing and discriminatory directives."  But "the only directives that . . . Mack allegedly gave Plaintiff were her instructions not to engage a temporary

employee in conversation." (Id. at 20-21 (quoting Am. Cmplt. (Dkt. No. 26) at 12; Def. R. 56.1
Stmt. (Dkt. No. 92) ¶ 43)) The Moving Defendants further argue that "[t]here is nothing
harassing or discriminatory about . . . Mack's having communicated these instructions," that
"Plaintiff admitted in her deposition that she did not know why . . . Mack instructed her not to
speak with the temporary employee," and that "[i]n light of this admission, Plaintiff cannot now
contend that . . . Mack harbored any discriminatory intent in providing this instruction." (Id. at
21 (citing Def. R. 56.1 Stmt. (Dkt. No. 92) ¶ 44))

   Plaintiff argues that she has "presented evidence that [she] suffered . . . adverse
work events . . . due to [her] membership in the protected classes." (Pltf. Opp. (Dkt. No. 105) at
26) She further argues that she has "presented evidence that [D]efendants' stated non-
discriminatory reason for [the] adverse work even[ts] was a pretext." (Id.)

   1. **Protected Activity**

   As discussed above, Plaintiff's complaint to Leung in January 2018 about Mack
was not protected activity, because Plaintiff was complaining about Mack's practice of giving
her directives, even though Mack "is not [her] boss and [Brown] do[es not] take directives from
her." (Pltf. Dep. (Dkt. No. 121-1) at 37) Because Brown's complaint to Leung was not about
discrimination premised on a protected characteristic, her complaint to Leung is not protected
activity. See Grewal, 2017 WL 1215752, at * 11; Aspilaire, 612 F. Supp. 2d at 308-09.

   Similarly, Brown's report to Leung in February 2018 that Crute had made a
personal phone call while at work (see Am. Cmplt. (Dkt. No. 26) at 13; Pltf. Dep. (Dkt. No. 121-
1) 37-38) is not protected activity, because Brown's report to Leung had nothing to do with

any discrimination premised on a protected characteristic.  See Aspilaire, 612 F. Supp. 2d at 308-09.

By contrast, Brown's December 8, 2015 complaint to Montefiore's compliance hotline regarding Defendant Rodriguez's gift of a "dirty green canvas bag" constitutes protected activity.  Brown complained at the time that Rodriguez gave her the bag "out of spite," that the gift was "offensive," and that Rodriguez engaged in this conduct in order "to be belittling and disrespectful of [Plaintiff's] beliefs."  Brown explained that she "does not celebrate Christmas and has told [Rodriguez] this many times."  (Reyes-Tutiven Decl., Ex. B (Dkt. No. 95-2) at 3) Plaintiff further complained that her co-workers were given Christmas gifts that were "nicely presented and beautifully wrapped."[9]  (Id.)  Brown's complaint to the hotline could be read to allege unfair treatment based on her religion.  (See id.; Reyes-Tutiven Decl. (Dkt. No. 95) ¶ 4 ("[Plaintiff] also filed a compliance complaint about her supervisor[] . . . Rodriguez alleging religious discrimination."))

Making a complaint to an employer's compliance hotline concerning alleged religious discrimination by a supervisor is an activity that "'protest[s] or oppose[s] statutorily prohibited discrimination.'"  See Kouakou, 920 F. Supp. 2d at 400 (alterations in original) (quoting Cruz, 202 F.3d at 566); see also Sarit v. Westside Tomato, Inc., No. 18 Civ. 11524 (RA), 2020 WL 1891983, at *7 (S.D.N.Y. Apr. 16, 2020) (alteration and omission in original) (quoting Rodriguez v. Beechmont Bus Serv., Inc., 173 F. Supp. 2d 139, 149 (S.D.N.Y. 2001)) ("'A "protected activity" under Title VII does not have to "rise to the level of a formal

---

[9]  Given that Plaintiff asserts that she did not want the "beautifully wrapped" Christmas presents Rodriguez gave to Brown's co-workers – because she does not celebrate Christmas – it is not entirely clear how Brown believes she was injured by Rodriguez's practice of giving Christmas gifts to co-workers other than Brown.

complaint,'" but rather may 'include[ ] activities of "making complaints to management," . . . and may be in the form of a simple "objection voiced to the employer."'"). In sum, the Court concludes that Brown's December 8, 2015 complaint to Montefiore's compliance hotline regarding Defendant Rodriguez's gift of a "dirty green canvas bag" constitutes protected activity.

Plaintiff's January 25, 2018 complaint that Plaintiff's co-workers "have been harassing [her] at the workplace," and that their conduct "has caused a consistent and hostile and stressful working environment" (Reyes-Tutiven Decl., Ex. A (Dkt. No. 95-1) at 13, 17) – despite the reference to a hostile working environment – does not constitute protected activity. Brown reported that her co-workers called her "inappropriate names, such as 'Queen Bathsheba[,]'" and used "verbal threats, improper innuendoes and speech designed to antagonize [Plaintiff]." (Id.) Brown also complains that she was not granted "scheduling privileges that are provided to others." (Id.) But in this complaint, Brown does not link her co-workers' conduct to her race, national origin, or religion.

Similarly, Plaintiff's other complaints to Montefiore's compliance hotline are not protected activity, because Brown did not complain that she had been treated unfairly because of her race, national origin, or religion. While Brown states that she has been the victim of "[h]arassment," and "[u]nfair [e]mployment [p]ractices," and complains that her co-workers do "not allow[] [her] to complete her work" and "invad[e] her space," and that Rodriguez has a "tendency to hold [Plaintiff] to a different standard than [Mack]" by "allow[ing] [Mack] to engage in non-work related tasks, and . . . fail[ing] to hold [Mack] accountable for her unprofessional outburst" (Reyes-Tutiven Decl., Ex. A (Dkt. No. 95-1) at 2-3, 6-7), Brown does not assert in her hotline complaints that any of this alleged misconduct relates to her race, national origin, or religion.

In sum, the only protected activity Brown engaged in is her December 8, 2015 complaint to Montefiore's compliance hotline regarding Defendant Rodriguez's gift of a dirty canvas bag, while Brown's co-workers were given "beautifully wrapped" presents.

**2.      Adverse Work Event and Whether Defendants' Conduct Is Reasonably Likely to Deter a Person From Engaging in Protected Activity**

The Moving Defendants do not address whether Brown has proffered evidence that (1) she suffered an adverse work event; (2) her supervisors engaged in conduct likely to deter a person from engaging in protected activity; or (3) there is a causal connection between Brown's protected activity and an adverse work event.

As discussed above, the only protected activity that Brown engaged in is her December 8, 2015 complaint regarding Rodriguez's gift of a canvas bag, which Brown regarded as a Christmas present and as an insult to her Jehovah's Witness faith.  Brown has not offered evidence that she experienced any adverse event, or any incident that would be reasonably likely to deter a person from engaging in protected activity, as a result of engaging in this protected activity.  Cf. Rozenfeld, 875 F. Supp. 2d at 207-08 (finding that Title VII and NYSHRL retaliation claims "fail as a matter of law" because "[p]laintiff demonstrates no causal connection between any alleged protected activity and the alleged adverse action," and that NYCHRL retaliation claim "fails as a matter of law" because "there is simply no causal connection between any alleged protected activity and any action taken by [d]efendant that reasonably could be construed as likely to deter a person from engaging in protected activity").

Because Plaintiff has not offered evidence that she suffered an adverse event that would be reasonably likely to deter a person from engaging in protected activity, much less that there is a causal relationship between her protected activity and any such adverse event or incident, she has not established a prima facie case of retaliation under Federal, State, or City

36

law.  See Malena, 886 F. Supp. 2d at 361-62 (S.D.N.Y. 2012).  Accordingly, the Moving

Defendants' motion for summary judgment on Plaintiff's retaliation claims under Title VII,

Section 1981, the NYSHRL, and the NYCHRL will be granted.

### C.     Remaining NYCHRL Claim

Having determined that the Moving Defendants are entitled to summary judgment

on Plaintiff's federal and state discrimination and retaliation claims and Plaintiff's retaliation

claim under the NYCHRL, the Court must now determine whether to exercise supplemental

jurisdiction over Plaintiff's remaining hostile work environment claim under the NYCHRL.  In

doing so, the Court must consider "several related factors – judicial economy, convenience,

fairness, and comity."  Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004); see also

28 U.S.C. 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a

claim . . . if . . . the district court has dismissed all claims over which it has original

jurisdiction").  "'[I]n the usual case in which all federal-law claims are eliminated before trial,

the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining

state-law claims.'"  Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006)

(omission in original) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

Given the different standards that apply to NYCHRL claims, "[c]ourts in this District routinely

decline to exercise supplemental jurisdiction over a plaintiff's NYCHRL claims after dismissing

all federal claims."  Espinoza v. N.Y.C. Dep't of Transp., 304 F. Supp. 3d 374, 391 (S.D.N.Y.

2018) (collecting cases).

Here, it was appropriate for the Court to consider Plaintiff's Title VII, Section

1981, and NYSHRL discrimination and retaliation claims together because, as discussed above,

Plaintiff's claims under these statutes are governed by the same legal standards.  See Schiano,

445 F.3d at 609 ("Hostile work environment and retaliation claims under the NYSHRL are

generally governed by the same standards as federal claims under Title VII."); Johnson v. City of New York, No. 17 Civ. 7585 (PKC) (RER), 2019 WL 4468442, at *13 (E.D.N.Y. Sept. 18, 2019) ("Claims of employment discrimination and retaliation under [Section] 1981 . . . are analyzed under the same framework that applies to Title VII claims.").  It was likewise appropriate for the Court to consider whether Plaintiff had offered sufficient evidence to make out a prima facie case of retaliation under Federal, State, and City law, because the prima facie case requirement exists under all of these statutes.

As discussed above, however, Plaintiff's NYCHRL discrimination claims require an analysis that differs from that under Federal and New York state law.  Courts "must analyze NYCHRL claims separately and independently from any federal and state law claims[] . . . construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'"  Mihalik, 715 F.3d at 109 (quoting Albunio v. City of New York, 16 N.Y.3d 472, 477-78 (2011)).  Accordingly, "comity counsels against exercising jurisdiction over Plaintiff's NYCHRL claim, as the NYCHRL 'has a lower threshold of proof than its federal counterparts' and 'has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it.'"  Harris v. NYU Langone Med. Ctr., No. 12 Civ. 0454 (RA), 2014 WL 941821, at *2 (S.D.N.Y. Mar. 11, 2014), aff'd, 615 F. App'x 49 (2d Cir. 2015) (quoting Thomas v. City of New York, 953 F. Supp. 2d 444, 462 (E.D.N.Y. 2013)).

Accordingly, having found that the Moving Defendants are entitled to summary judgment on Plaintiff's federal claims, the Court will decline to exercise supplemental jurisdiction over Plaintiff's hostile work environment claim under the NYCHRL.

## CONCLUSION

For the reasons stated above, Defendants Montefiore Medical Center, Mack, Crute, and Leung are granted summary judgment on (1) Plaintiff's hostile work environment claims under Title VII, Section 1981, and the NYSHRL; and (2) Plaintiff's retaliation claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL. The Court declines to exercise supplemental jurisdiction over Plaintiff's hostile work environment claim under the NYCHRL, and dismisses that claim without prejudice.

As noted above, Defendant Rodriguez has not appeared in this case, and she has not joined in the Moving Defendants' motion for summary judgment. Because it appears that Plaintiff's claims against Defendant Rodriguez are insufficient for the reasons set forth above and in this Court's July 21, 2019 order (see July 21, 2019 Order (Dkt. No. 52)), Plaintiff will show cause by **August 7, 2023**, why her claims against Defendant Rodriguez should not be dismissed. In the event that Plaintiff does not show cause by that date, her claims against Defendant Rodriguez will be dismissed for failure to prosecute. This case will remain open during the interim.

The Clerk of Court is directed to terminate the motion (Dkt. No. 91), and to mail a copy of this order to pro se Plaintiff.

Dated: New York, New York
      July 25, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge